COLLINS' ESTATE *v.* DUNN, *et ux.*

No. 40772          June 9, 1958          103 So. 2d 425

638

*Fulton Thompson, R. H. & J. H. Thompson, Alexander & Alexander,* Jackson, for appellant.

*Crisler, Crisler & Bowling, E. B. Todd,* Jackson, for appellees.

KYLE, J.

This case is before us on appeal by L. T. Wisdom, Executor of the last Will and Testament of Edward J. Collins, deceased, from two decrees of the Chancery Court of Hinds County rendered in the course of the administration of the estate of said deceased. The first appeal is an appeal by said executor from a decree rendered on April 3, 1957, approving and allowing the probated claim of S. M. Dunn and Mrs. S. M. Dunn against the estate of the deceased for the sum of $5,320. The second appeal is an appeal by said executor from a decree rendered on April 10, 1957, construing Item 10 of the will of said deceased, relating to the payment of the cost and expenses of the probate proceedings.

The record in the case shows that Edward J. Collins, died on January 10, 1957, and that his last will and testament was duly admitted to probate by the chancery court on January 12, 1957, and letters of executorship were issued to Lemuel Tom Wisdom on the last mentioned date.

A few days after the will had been admitted to probate, S. M. Dunn and his wife, Mrs. S. M. Dunn, the appellees herein, filed a petition asking that the will be set aside and that title to the property owned by the deceased be vested in them, or, in the alternative, that the court allow them a reasonable sum for services rendered to the deceased during the period of time from November 26, 1951, until his death on January 10, 1957, at the rate of $15 per day, making a total sum of $28,050. In their petition the Dunns alleged that they had lived with and cared for the deceased from November 26, 1951, until his death, and that they had purchased and furnished food and other supplies for him, and had waited on him, and that said services had been rendered in consideration of a firm and binding agreement on the part of the deceased to compensate them therefor; that the deceased had agreed to execute a will devising and bequeathing all of his property to them: and that they were entitled to all property owned by him at the time of his death. The petitioners therefore prayed for the will to be set aside and that title to all property owned by the deceased be vested in them, or that they be allowed reasonable compensation for their services as stated above.

L. T. Wisdom, as executor, and individually, as a devisee under the will, and Mrs. Lula Price Allbritton, a devisee under the will who were named as defendants, filed an answer to the petition, and in their answer denied that there was any binding agreement on the part of the deceased concerning the disposition which he should make of his property at his death, or any promise made by the deceased to devise his lands to the petitioners. The defendants admitted that the petitioners lived in the home occupied by Edward J. Collins, but they denied that the petitioners had rendered to the deceased any services for which they had not been compensated. The defendants denied that the deceased had agreed at any time to execute a will in favor of the petitioners; and the

defendants denied that the petitioners were entitled to any property owned by the deceased at the time of his death, or that they were entitled to have the court allow a probated claim for services rendered. The defendants also incorporated in their answer a demurrer to the petition.

The demurrer to the petition was overruled, and the cause was heard by the chancellor upon the pleadings and proof.

More than twenty witnesses testified during the hearing. We shall not undertake to give a detailed summary of the testimony of all of the witnesses. We shall make a brief reference, however, to the testimony of Jerry Loftin, who was the only witness who testified concerning the alleged oral agreement to execute a will in favor of the claimants.

Loftin testified that he picked up Mr. and Mrs. Dunn at a bus stop in front of his house sometime during the latter part of November 1951 and carried them over to Mr. Collins' home on Rose Street in the City of Jackson, to answer an advertisement that some old man over there had published in a newspaper for someone to live with him and care for him; and that Mr. Collins told the Dunns at that time that he was looking for someone who would come there and live, and that he would furnish the utilities and groceries. Mr. and Mrs. Dunn did not like that idea, and Mr. Collins then said, "I will tell you what I will do with you. If you people will come here and live with me and buy the groceries and furnish all the utilities I will will you all of my property." Mrs. Dunn asked Mr. Collins if he would give them that statement in writing. Mr. Collins said, "There is no use giving it in writing; we will just shake hands on it." So Mr. Dunn and Mr. Collins shook hands on it. Mr. Collins said: "I am an old man left in this world alone, and I have no relatives whatsoever, and at my death all this property will become yours." The witness stated that Mr. Collins told Mr. and Mrs. Dunn that he wanted his meals at

certain times, and he wanted them seven days a week. Mr. and Mrs. Dunn were to furnish all the utilities and all the groceries. Loftin stated that after the Dunns moved into the Collins home his wife took sewing over to Mrs. Dunn, and he and his wife would sit there in the living room and talk to Mr. Collins; that the will was never mentioned again to him. On cross-examination Loftin stated that Mr. Collins did not define the nature of his property. He just said, "I own this house here and another house and a store." He said that he had enough money to do him the rest of his life. The witness stated that Mr. Collins' physical condition seemed to be pretty fair at the time the Dunns moved in, and that he had never been in Mr. Collins' home when Mr. Collins was in bed. It seemed that he was in fair health.

The chancellor found that the arrangements agreed to, according to Loftin's testimony, were that the Dunns should move into the Collins residence and have the use of the residence, with the exception of one room, rent free, provided they would pay the utilities and that in turn Collins was to be premitted to retain a room which was to be cleaned and cared for by Mrs. Dunn, and that he was to receive his meals free of charge—that is to say, that the Dunns were to pay for the food and to prepare and serve him three meals a day; and that, according to Loftin, Collins made a remark to the effect that if the Dunns would accept his proposition they would be the recipients at his death of his property. The chancellor found that Loftin's testimony was not at all clear as to what property Collins was talking about; that Loftin in fact candidly stated that he did not recall that Collins made any detailed statement indicating what property he had or what property he may have had in mind that the Dunns might come into at his death.

The chancellor found that, after the above mentioned conversation between Collins and the Dunns, the Dunns moved into the Collins house about November 26, 1951, and remained there until Collins' death on January 10,

1957; that Mrs. Dunn, during that time, kept the house clean and neat throughout, including the room occupied by Mr. Collins, and that she prepared the meals for the three, that is, the Dunns and Mr. Collins; that the Dunns bought the groceries and other household utilities, with the exception of some brooms and mops, which Mr. Collins bought himself. There was a conflict in the testimony as to who paid for the utilities, but it was the opinion of the court that the evidence as a whole indicated that the utilities were paid for by the Dunns.

The chancellor found that Collins was a man who enjoyed unusually good physical health and mental stability throughout the entire five-year period; that only one time during that period was he ill to the extent that it was necessary for him to go to the hospital; and that there was nothing in the record to show that he was anything near a bed patient, or one who required a lot of practical nursing or other bedside care.

The chancellor found that the evidence relating to the alleged agreement to execute a will was entirely insufficient to show that any binding agreement had been entered into for a devise of real estate to the Dunns, but that Collins had led the Dunns to believe that they would receive something more than a rent-free house in consideration of the care which they provided for him, and that the Dunns were entitled to something over and above the rent-free quarters in the Collins home for what they had done for him.

The chancellor therefore denied the prayer of the petition to set aside the will, but allowed the Dunns' claim for compensation on a quantum meruit basis for services rendered, over and above the value of the rent-free occupancy of the Collins home in the amount of $20 per week for the five years and two months period, making a total amount of $5,320. The chancellor arrived at the above mentioned figure by holding that the rental value of the house was $50 per month, and that the food for

Mr. Collins amounted to approximately $50 per month, and that the additional compensation at the rate of $20 per week should be allowed ''for the sweeping and cleaning and washing and cooking.''

The attorneys for the executor in this case argue two points as grounds for reversal of the decree of the lower court: (1) That the claimants failed to prove by a preponderance of the evidence that there was an implied agreement between Mr. Collins and the Dunns for the payment to the Dunns of any amount of compensation for the services rendered, other than permitting them to have the use of the house free of rent; and (2) that in any event the amount of the allowance of $5,320 as additional compensation was grossly excessive, in view of the services rendered. The attorneys for the executor say that there is no proof in the record to show that Mr. Collins agreed that Mrs. Dunn should be paid for her services as a cook, maid or practical nurse, and that up until the time of Mr. Collins' death both he and the Dunns were thoroughly satisfied with the arrangement whereby Mr. Collins was to furnish the home and the Dunns were to furnish him his board.

After a careful reading of the testimony, we are unable to say that the chancellor was manifestly wrong in his finding that the Dunns had been led to believe that they would receive something more than a rent-free house for the services which they were to render when they moved into the Collins home; and there is evidence in the record to support the chancellor's finding that the Dunns rendered the services which they did render with the expectation that they would receive some payment therefor in addition to the use of the rent-free house. But we think the amount allowed by the chancellor was grossly excessive in view of the services rendered.

It is generally held that an oral agreement to convey land by will or otherwise is within the statute of frauds, and specific performance of such agreement can-

not be enforced. Ellis v. Berry, 145 Miss. 652, 110 So. 211. ■■ But this Court has recognized the principle that, when parties make an oral agreement that one is to care for and support the other and that the latter will make compensation therefor and such services are rendered, but not paid for by the latter during his lifetime, the party who has rendered the care and provided the support under such an agreement may recover therefor on the quantum meruit. Ellis v. Berry, supra; First National Bank v. Owen, 177 Miss. 339, 171 So. 4; Hickman v. Slough, 187 Miss. 525, 193 So. 443; In Re Estate of Whittington, deceased, 217 Miss. 457, 64 So. 2d 580. ■■ This Court has said, however, many times, that claims of the character mentioned above, brought up for the first time after the death of the decedent, are looked upon by the courts with disfavor; and in order to maintain such a claim the evidence must clearly establish a contract, express or implied, between the claimant and the decedent, for the payment of compensation for such services. Bell v. Oates, 97 Miss. 790, 53 So. 491; Ellis v. Berry, supra; Wells et al v. Brooks, 199 Miss. 327, 24 So. 2d 533.

■■ Where the evidence is sufficient to establish the claimant's right to recover in such case, the amount of the recovery is limited to the reasonable value of the services actually rendered to the decedent for which payment has not been received. Ellis v. Berry, supra. See also 34 C. J. S., 116, Executors and Administrators, par. 372.

■■ The amount which the Dunns were entitled to recover in this case was not the value of the property which they hoped or expected to receive under Mr. Collins' will, but only the reasonable value of the services rendered over and above the value of the use of the rent-free house, not including the room reserved by Collins for his own use.

There is little dispute as to the nature of the services rendered by the Dunns during the five-year period of

time they lived in the Collins home. The testimony shows that Mr. Collins was furnished three meals each day, and that his room was kept clean. As the chancellor stated, the evidence in the case revealed that "not a great deal of unusual care was required" for Mr. Collins. The chancellor stated that in his opinion the cost of the food which Mr. Collins consumed was approximately offset by the rental value of the Collins house. The additional compensation was allowed for "sweeping, cleaning and cooking," and such other care as was required. The evidence shows, however, that Mr. Collins occupied only one room of the house, and that he was only one of the three persons for whom meals were prepared; and if Mr. Collins had not lived in the house Mrs. Dunn would have still found it necessary to prepare meals for herself and her husband and perform the other routine duties of a housekeeper. There is no proof in the record which indicates that Mr. Collins was at any time feeble and decrepit to the extent that he needed the services of a practical nurse. The proof on the other hand shows that he was unusually active physically for a man of his age until the time of his death; that he was able to go wherever he wished to go without an attendant; and that he was accustomed to attending boxing matches and picture shows.

The facts in this case are entirely unlike the facts in the cases of Ellis v. Berry, supra, and First National Bank v. Owens, supra, upon which the appellee's attorneys rely mainly in their argument for an affirmance of the chancellor's decree. In each of those cases the claimants furnished the home in which the parties lived. In Ellis v. Berry, the claim allowed was for services which included providing a home, food and board for the deceased over a long period of years, including his washing and the mending of his clothes and services during his sickness. In First National Bank v. Owens, the record showed that Mrs. Peck went to the home of the ap-

pellee to live, when she was about 75 years of age; that she was afflicted with rheumatism and diabetes which rendered her practically helpless much of the time, and at all times, day and night, her condition required watchfulness of some competent person within call; and that the appellee gave her board, prepared her meals, did her laundry, and administered her medicines which included on the average two hyperdermic injections of insulin per day. We have no such state of facts as that in this case.

■■■ In Tchula Commercial Company v. Jackson, 147 Miss. 296, 111 So. 874, this Court held that, under Section 4919, Code of 1906 (Section 1962, Code of 1942) when a judgment or decree rendered by a chancellor is clearly excessive and all the facts are found by the chancellor, and where the amount of the judgment is based on facts and opinions of witnesses as to value, this Court will, on reversing the decree as to the amount of the damages, render judgment for the proper amount without remanding the cause to the court below.

■■■ We think the evidence in this case was sufficient to support the chancellor's finding that some additional compensation should be allowed the Dunns for the services rendered by them, over and above the value of the use of the rent-free house. But, in our opinion, the amount allowed by the chancellor is clearly excessive. The decree of the lower court allowing the claim will therefore be modified so as to reduce the amount of the allowance to $3,000, and the decree as thus modified will be affirmed.

After the rendition of the above mentioned decree by the lower court, Mrs. Lula Price Allbritton, a devisee under Item X of Mr. Collins' will, filed a petition in the administration proceeding asking that the court construe Item X of the will. In that item the testator devised to Mrs. Allbritton the residence property on Rose Street which was occupied by him at the time of his death, and

a part of the furniture and fixtures, upon the condition, however, that Mrs. Allbritton should pay all doctors, nurses, medical and hospital bills that might be incurred during his last illness, and also the funeral expenses and the cost of a gravemarker, "together with the costs and expenses of the probate proceedings" in connection with the will. The petition to construe that item of the will was filed for the purpose of having the court determine whether the claim of the Dunns should constitute a specific charge against the property devised to Mrs. Allbritton in said Item X only, or against all of the real estate owned by the testator at the time of his death. The executor filed an answer to the petition; and after hearing the proof, the chancellor held that the phrase "together with the costs and expenses of the probate proceedings," as used in Item X of the will, did not include the probated claims against the estate, such as the claim of the Dunns, but only the costs and expenses incurred in the administration of the estate, including attorneys' fees for services rendered the executor in his official capacity and executor's fees, and that the property devised to Mrs. Allbritton should be charged with only its proportionate part of the amount required to pay the probated claim of the Dunns, such proportionate part to be determined according to the value of the tract of land devised to Mrs. Allbritton as compared with the total value of all of the real estate owned by the testator at the time of his death.

The court therefore ordered that the real estate devised under the terms of the will be sold, if necessary, to pay the probated claims, and that the proceeds of the sale of each tract of land should be charged with its proportionate share of the probated claim allowed in favor of the Dunns and such other probated accounts as might be filed, other than those enumerated in Item X of the will as claims and expenses which were to be charged

against the property devised to Mrs. Allbritton. From the order directing that each parcel of the real estate be charged, if necessary, with its proportionate share of the Dunns' claim, as set forth above, L. T. Wisdom, as executor and as a devisee under the will, has prosecuted an appeal.

██ ██ We have made a careful study of the provisions of Item X in the light of the circumstances existing at the time of the execution of the will; and we think there was no error in the chancellor's holding that the words "costs and expenses of the probate proceedings," did not include the payment of claims probated against the estate such as the claim of the Dunns. The decree of the chancellor on that issue is therefore affirmed.

██ ██ The costs on this appeal shall be apportioned and taxed against the parties as follows: One-half of the costs shall be taxed against the estate of Edward J. Collins, deceased, L. T. Wisdom, Executor; and the remaining one-half shall be taxed against the Dunns.

Affirmed in part, modified and affirmed in part, and judgment rendered and cause remanded.

*McGehee, C. J.,* and *Roberds, Holmes* and *Ethridge, JJ.,* concur.

GILLESPIE, Justice, concurring in part, dissenting in part:

I concur in the part of the decision construing Item X of the will. With deference, I do not think the Dunns were entitled to recover anything from the estate. However, assuming they were entitled to additional compensation, I think the amount allowed was excessive. Therefore, I concur in the modification.

As I construe the chancellor's findings, he found that the Dunns undertook to render the services to Mr. Collins under an agreement that in return therefor the Dunns

would receive free house rent; and that there was no contract for making a will. It is true that the chancellor found that the Dunns were led to believe that Mr. Collins would leave them something under his will. Under the chancellor's finding, the hope and expectation of the Dunns that they would receive something under Collins' will cannot be the basis of any recovery. Nothing then is left but the contract and the compensation of the Dunns was fixed thereby. Free house rent was the measure of their compensation. The majority has superimposed upon the contract additional compensation on a quantum meruit basis. There must be a single standard for measuring compensation in a matter of this kind. If the contract provided for compensation for the services rendered by the Dunns—and it did—the contract is the standard. If the contract had not provided for the measure of compensation, the standard would be quantum meruit.

HALL, J., dissenting:

I respectfully dissent from that part of the majority opinion which holds that the amount awarded by the chancellor is excessive and should be reduced to $3,000, and in taxing Mr. and Mrs. Dunn with any part of the appeal costs.

Mr. Collins, the testator, had no living relatives and after his wife had died he induced Mr. and Mrs. Dunn to move into his home under a promise, which was proven by overwhelming evidence, to the effect that he would will them the home if they would stay there and care for him and feed him three meals a day. In my opinion he never had any intention of willing them anything, and in fact when he made a will he told the attorney who prepared it that the Dunns were expecting something out of him but were not going to get it, and accordingly he made a will wherein he gave them nothing and devised his property to two other people.

He was getting old and it is fortunate that he did not have any long spell of illness during the more than five years that the Dunns lived in the home and took care of him. He was evidently a very demanding man. After the Dunns got in the home, he gave them to understand that he would have to have his meals three times a day and that every meal must be hot and that he would not eat any leftovers. I think the controlling opinion unduly emphasizes how little extra Mrs. Dunn had to do. When most homes throughout the country are satisfied with two hot meals a day, Mrs. Dunn had to go to the kitchen the third time every day and cook a hot meal, and it is no little item to further consider that the Dunns were paying for the groceries and that Mr. Collins would not permit any leftovers. I think the amount which the chancellor awarded in this case is amply supported by the testimony.

*Lee* and *Arrington, JJ.,* join in this dissent.